SO ORDERED.

SIGNED this 7th day of July, 2016.



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

PUBLISH

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:

MARK SAMUEL LARKIN and,
CAROLINE MARIE LARKIN

                Debtors.

Case No. 10-13339
Chapter 13

MARK SAMUEL LARKIN and,
CAROLINE MARIE LARKIN

                Plaintiffs,
vs.

BANK OF AMERICA, N.A.

                Defendant.

Adv. No. 15-5119

1

# MEMORANDUM OPINION

If ever a bank asked to be sued, this is it. Bank of America's (BOA's) conduct in "administering" the mortgage loan modifications sought and granted to the plaintiffs in this case reflects, at best, utter disarray in its home loan operations. It is the sort of non-responsive and high-handed conduct that led to the United States and about forty states obtaining a consent judgment against BOA that required it to drastically change its loan modification practices. After the consent judgment was entered in 2012, BOA granted the Larkins a final modification in 2015 that resolves some of the claims raised in their complaint. Because the 2015 agreement between BOA and the Larkins superseded their earlier efforts, the Larkins' breach of contract claims based on former modification agreements must be dismissed. Those of their claims for violations of the federal Fair Debt Collection Practices Act (FDCPA) and the Kansas Consumer Protection Act (KCPA) that are not time-barred, either cannot be maintained against BOA because it is neither an FDCPA " debt collector" nor a KCPA "supplier" at state law, or are preempted by the Bankruptcy Code. As inept and infuriating as BOA's pattern of conduct was, the Larkins' complaint fails to state a claim and must therefore be dismissed under Fed. R. Civ. P. 12(b)(6).[1]

## I.     Factual Allegations[2]

---

[1] The plaintiffs Mark and Caroline Larkin appear by their attorneys Christopher A. McElgunn, Todd E. Shadid, and Michelle L. Brenwald of Klenda Austerman LLC. The defendant Bank of America, N.A. appears by its attorneys Michelle M. Masoner and James D. Lawrence of Bryan Cave LLP.

[2] In addressing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court takes the allegations of the complaint to be true. Fed. R. Bankr. P. 7012(b) makes Civil Rule 12(b)(6) applicable in adversary proceedings.

In 2007, BOA loaned the Larkins $267,635 on a 30-year note secured by a mortgage on their home in Wichita, Kansas. BAC Home Loans Servicing, L.P. serviced the loan. The promissory note was payable at a fixed interest rate of 6.125% in monthly principal and interest payments of $1,626.18. The servicer, "BAC Home Loans Servicing, L.P. fka Countrywide Home Loans Servicing, L.P. as servicer for Bank of America, National Association," filed a proof of claim for this debt in the Larkins' eventual chapter 13 case here.[3] The Larkins say that at some point, BOA merged with and succeeded BAC, making BOA liable for BAC's conduct.[4] BAC serviced the loan until July 1, 2011, when BOA took over. The Larkins further allege that the loan was transferred to BOA effective March 2, 2010 pursuant to a BAC notice dated April 1, 2010. How BAC got the loan initially remains unknown (or at least unpled).[5] Suffice it to say that, based on the Larkin's allegations, BOA has had some interest in the loan at nearly all relevant times.

### The 2010 Loan Modification

---

[3] *See* Proof of Claim 7-1, Part 3, p.1 (Creditor Information), filed December 13, 2010.

[4] The Larkins do not consistently allege in the Complaint whether BAC or BOA sent the communications or notices they received, and when alleging the attempted loan modifications starting in 2009, identify the party as "Defendant" without regard to whether the Larkins were dealing with BAC or BOA, presumably based upon the alleged merger. For ease of reference, the Court will refer to the named defendant, BOA, in this opinion, even though it appears the Larkins were dealing with the loan servicer, BAC in the 2009-2010 time period.

[5] The Larkins allege that on notices sent by loan servicer BAC in November 2009, it identified an entity "GNMA II 3861 LBAC173" as the creditor to whom the mortgage loan debt was owed, and on a notice sent by BOA on February 8, 2011 an entity identified as "CIG-HFI 1st Lien EPBO" was identified as the creditor. Even so, there is no dispute that the mortgage debt that is the subject matter of this proceeding, is the 2007 mortgage loan originated by BOA.

**3**

Twice before their 2010 bankruptcy case, the Larkins sought HAMP (Home Affordable Modification Program) loan modifications. Neither of these was ever implemented. On December 30, 2009, BOA advised the Larkins they were "pre-approved" for assistance and offered yet another modification of the mortgage loan. The Larkins provided the eligibility information BOA requested. As directed, they signed and returned the documentation along with an immediate payment of $2,536 on January 12, 2010. They believed that they had entered into a loan modification with the following terms ("2010 Loan Modification"):

| | |
|---|---|
| Principal Balance: | $276,838 |
| Monthly Payment:[6] | $1,914 |
| Interest Rate: | 4.5% |
| Maturity: | February 1, 2040 |

Though the Larkins began paying the new monthly amount, BOA never applied the payments. Instead it continued to send mortgage statements to the Larkins that didn't reflect the terms of the 2010 Loan Modification. When the Larkins asked BOA about these statements and the status of the 2010 Loan Modification, they were told it was being processed. Then, in September of 2010, BOA told them their file had been reassigned to a new representative. During this period, BOA sent the Larkins four default notices warning of its intent to accelerate.

### Larkins' Bankruptcy and Incorporation of 2010 Loan Modification in Confirmed Plan

---

[6] It appears the monthly payment included principal and interest, taxes and insurance, but the Larkins do not break down the amount of each component of the monthly payment. By way of comparison, the original total monthly payment was $2,137.74, comprised of $1,626.18 principal and interest and $511.56 for taxes/insurance escrow. *See* Claim 7-1, Part 3, p. 2.

4

On September 29, 2010 the Larkins filed a chapter 13 bankruptcy petition and proposed a plan. They scheduled BOA as their mortgage lender and, in their proposed plan, agreed to pay BOA under the 2010 Loan Modification by making monthly payments of $1,914 through the plan. The Larkins continued to make payments to the chapter 13 trustee that included the loan payment and the trustee disbursed $10,743 to BOA. BOA refused to apply the funds to the Larkins' mortgage loan. After their bankruptcy filing, BOA twice more considered the Larkins for a loan modification in 2010, and sent four monthly statements to the Larkins advising their monthly post-petition payments were $2,233. This suggests either a disconnect within BOA or that it did not believe that the 2010 Loan Modification was in effect.

When BOA filed its proof of claim in December of 2010, the Larkins objected, asserting that their home loan had been modified by the 2010 Loan Modification Agreement.[7] In response to the Larkins' objection, BOA acknowledged the 2010 Loan Modification but alleged that the Larkins had defaulted, causing the loan to revert to its original terms.[8] The proof of claim did not match the terms of the 2010 Loan Modification. Instead, it asserted an arrearage of $19,937 and a monthly payment of $2,137. Then, late in April of 2011, BOA sent a letter offering the Larkins *another* modification. That led the parties to reach an agreement resolving the Larkins' objection to BOA's claim and the Larkins withdrew their objection.[9] On September 18, 2011, the Larkins amended their plan, incorporating the 2010 Loan Modification

---

[7] Case No. 10-13339, Dkt. 27.
[8] Case No. 10-13339, Dkt. 31.
[9] Case No. 10-13339, Dkt. 59.

**5**

terms and proposing to make direct payments of $1,914.26 to BOA, outside the plan. Under their proposal, they would be deemed current with no prepetition arrearage.[10] The amended plan stated:

> **NON-STANDARD PROVISIONS FOR ¶ 9(b):**
>
> The $1914.26 to be paid outside the plan is per a loan modification approved by both parties and includes escrow for insurance and taxes. The loan modification entered into by the parties provides for principal and interest of $1402.70. There is no arrearage, and debtors are deemed current, and Bank of America shall report to credit agencies that debtors' loan is not in default. Any informational statements sent to the debtors should reflect the correct balance of the loan and correct payment amount under the modified terms.[11]

BOA did not object to confirmation and the plan was confirmed on January 25, 2012.[12] Larkins' bankruptcy counsel sent notice of the confirmed plan to BOA's counsel. Counsel's subsequent requests for BOA to account for payments on the modified loan were ignored.

BOA continued to send monthly statements "for informational purposes" containing a summary of Larkin's loan terms. Still the terms remained inconsistent with the terms of the confirmed plan and the 2010 Loan Modification. BOA continued to reject the Larkin's monthly mortgage payments and representatives refused to discuss the loan with them, insisting that they were barred from doing so by the bankruptcy stay.[13]

### *The 2015 Loan Modification*

---

[10] Case No. 10-13339, Dkt. 62, p. 5.
[11] *Id.* at p. 6.
[12] Case No. 10-13339, Dkt. 71.
[13] *See* Complaint, ¶s 95-142

**6**

In April of 2012, the United States and many of the states sued BOA for its pattern of conduct in administering HAMP modifications. BOA entered into a consent judgment that required it to offer homeowners permanent modifications.[14] In November of 2014, BOA offered the Larkins a *permanent* modification of their mortgage loan forgiving $185,504.35 of principal and reamortizing the remaining principal balance of $161,000.01 at a significantly reduced rate of interest. The Larkins were approved for a 3-month trial period plan.[15] After the Larkins made the trial period payments, BOA confirmed the completion of the trial period in a letter dated February 7, 2015 and advised the loan would be permanently modified if BOA received an executed copy of the Modification Agreement by March 24, 2015. The Larkins duly signed and timely returned the Modification Agreement and, on March 16, 2015, filed a motion for approval of the Mortgage Modification Agreement ("2015 Loan Modification") in their bankruptcy case, attaching a copy of the Agreement to their motion. The Court approved the 2015 Loan Modification on April 23, 2015, permanently modifying the BOA mortgage loan as of March 1, 2015.[16] The 2015 Loan Modification is between "Bank of America, N.A. the servicer and/or lender for your loan ("Lender")" and the Larkins, as borrowers, and includes the following terms:

Principal Balance:       $161,000.01

---

[14] *United States, et al. v. Bank of America Corp, et al.*, Case No. 12-cv-0361 (D. D.C. April 4, 2012).

[15] This offer was made pursuant to a loan assistance program arising from the  consent judgment that BOA and BAC entered into of claims brought by the United States Department of Justice and various States regarding servicing and administration of home mortgage loans.

[16] Case No. 10-13339, Dkt. 109.

Monthly Payment:[17] $1,183.33
Interest Rate: 2.000%
Maturity: 268 months commencing March 1, 2015 [22.333 years, the remaining term of the original 30-year mortgage]

The Larkins continued to make direct monthly mortgage payments in this amount "outside the plan."[18]

BOA periodically filed Notices of Mortgage Payment Change in the Larkins' bankruptcy case.[19] All but one of the payment changes reflected an escrow change or adjustment to the monthly payment. The June 23, 2015 notice of payment change reflects the change in total monthly payment due to the 2015 Loan Modification (reduced principal and interest) and attaches an executed copy of the 2015 Loan Modification. On August 10, 2015, the chapter 13 trustee filed a notice stating that the Larkins had completed payments on their chapter 13 plan.

### *This Action against BOA*

On May 14, 2015, shortly after the 2015 Loan Modification was approved, the Larkins filed this civil action, suing BOA in the United States District Court for this District, seeking damages in excess of $75,000, civil penalties, attorney's fees, interest and costs.[20] They claim that BOA breached the 2010 Loan Modification, violated the Fair Debt Collection Practices Act (FDCPA, 15 U.S.C. § 1692 *et seq.*), and violated the

---

[17] The monthly payment was comprised of $745.36 for principal and interest and $437.97 for escrow of taxes and insurance. The Agreement plainly states that the escrow amount may be adjusted periodically and therefore the total monthly payment may likewise change. Case No. 10-13339, Dkt. 104, p. 5.

[18] Case No. 10-13339, Dkt. 104.

[19] *See* Claims Register, Claim No. 7.

[20] *See* Adv. No. 15-5119, Dkt. 2, Complaint in *Larkin v. Bank of America, N.A.,* Case No. 15-1151-MLB (D. Kan.) (hereafter "Complaint").

**8**

Kansas Consumer Protection Act (KCPA, KAN. STAT. ANN. § 50-623 *et seq.*). The FDCPA and KCPA claims assert BOA violated those Acts in its dealings with the Larkins while they were in bankruptcy. Neither the 2010 Loan Modification agreement nor any other exhibits were attached to the Larkins' Complaint.

BOA moved to refer the case to this Court where the bankruptcy case was pending and filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6).[21] On September 10, 2015, the District Court concluded the Larkins' suit was "related to" the bankruptcy case and granted BOA's motion to refer; it transferred the case to this Court where it now proceeds as currently captioned.[22] By the time the District Court transferred the case, BOA's motion to dismiss had been fully briefed by the parties.[23]

## II.      Rule 12(b)(6) Dismissal Standards

The Larkins' complaint states a claim upon which relief may be granted if the facts as pled could plausibly support a cause of action against BOA without regard for whether they could ultimately prevail on the claim.[24] The claim must be plausible on its face.[25] A plausible claim is one that shows more than a sheer possibility and less than a probability that plaintiffs are entitled to the relief they seek.[26]   The pleading of labels and conclusions rather than facts is insufficient; merely reciting

---

[21] Adv. Dkt. 1-4 and 1-6.
[22] Adv. Dkt. 1.
[23] Adv. Dkt. 1-7, 1-8, and 1-24.
[24] *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (In ruling on a motion to dismiss the judge must accept all allegations as true and may not dismiss on the basis that it appears unlikely the allegations can be proven.).
[25] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (enough facts must be alleged to nudge the claim across the line from conceivable to plausible).
[26] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

**9**

elements of a cause of action or the language of a statutory cause of action is also inadequate.[27]

The Larkins attached five exhibits to their response to BOA's motion to dismiss: (1) the recorded 2007 BOA mortgage; (2) the 2015 Loan Modification Agreement; (3) the 2012 consent judgment with attached exhibits entered in *United States of America, et al. v. Bank of America Corp., et al,* Case No. 12-cv-0361 (D. D.C. Apr. 4, 2012); (4) BOA's Notice of Approval of 2015 Principal Forgiveness Modification; and (5) Kansas Legislative Research Dept. Supplemental Note re: Kansas S.B. 57, amending KCPA.

Because the Court can take judicial notice of some of the extra-pleading exhibits, there is no need to convert this motion to dismiss to one for summary judgment as Fed. R. Civ. P. 12(d) might otherwise require.[28] Some of these documents were filed in the chapter 13 bankruptcy case. The 2007 BOA mortgage is an exhibit to BOA's proof of claim.[29] The 2015 Loan Modification was filed in the case and approved. It is also attached to a Notice of Mortgage Payment Change filed in the

---

[27] *Id.* (complaint is insufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement,' " citing *Twombly,* 550 U.S. at 557.).

[28] Civil Rule 12(d) is incorporated by Fed. R. Bankr. P. 7012(b). *See Grynberg v. Koch Gateway Pipeline Co.,* 390 F.3d 1276, 1278 n.1 (10th Cir. 2004); *Van Woudenberg v. Gibson,* 211 F.3d 560, 568 (10th Cir. 2000) (A court is permitted to take judicial notice of its own files and records), *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946, 955 (10th Cir. 2001); *Navajo Nation v. Urban Outfitters, Inc.,* 935 F. Supp. 2d 1147, 1157 (D.N.M. 2013) (Conversion of motion to dismiss to one for summary judgment is not required under Rule 12(d), where court can properly take judicial notice of the extra-pleading materials); *J.P. Morgan Trust Co. Nat. Ass'n v. Mid-Am. Pipeline Co.,* 413 F. Supp. 2d 1244, 1257-58, 1260-61 (D. Kan. 2006).

[29] *See* Proof of Claim No. 7, as amended.

10

case on June 23, 2015.[30] I can take judicial notice of the confirmed chapter 13 plan incorporating the 2010 Loan Modification and any other pleadings in the bankruptcy case referred to in the Complaint or the memoranda. The consent judgment against BOA is a court record that is a matter of public record and subject to judicial notice.[31] Larkins' exhibits 4 and 5 are not matters of which the Court can take judicial notice and I did not consider them here.

### III.     Breach of Contract Claim Based upon Repudiation of the 2010 Loan Modification

BOA and the Larkins were bound by the plan that incorporated the terms of the 2010 Loan Modification and was confirmed on January 25, 2012.[32] The Larkins claim that BOA repudiated its contractual obligations under the modification and breached it by refusing to accept loan payments after confirmation and failing to apply them to the debt. They generally claim that they were damaged by BOA's breach. The Larkins took no measures in the bankruptcy court to enforce the 2010 Loan Modification by pursuing BOA for noncompliance with the confirmed plan or for contempt. Instead, after entering into the 2015 Loan Modification and only 21 days after its approval by the bankruptcy court, they filed this lawsuit for breach of the 2010 Loan Modification contract among other claims.

### A.     The Post-Confirmation 2015 Loan Modification superseded the 2010 Loan Modification.

---

[30] *See* Dkt. 104, 109, and Notice of Payment Change filed as doc. June 23, 2015.

[31] It appears that the consent judgment was the genesis for the 2015 loan modification in that the defendants to the consent judgment agreed *inter ali*a to provide "refinancing relief" to borrowers, to include principal reduction or forgiveness modifications, as part of the settlement with the United States Justice Department and various States.

[32] See 11 U.S.C. § 1327(a) (Provisions of confirmed plan bind debtor and each creditor).

**11**

Because the 2015 Loan Modification constituted an entirely new contract, it is fatal to the Larkins' contract claim that is based on the 2010 agreement. The 2015 Loan Modification Agreement, effective March 1, 2015, amended and supplemented the original 2007 note and mortgage along with *any previous modifications* to the note and mortgage.[33] Because the Larkins were in bankruptcy, court approval of the 2015 Loan Modification was required.[34] Section 3 of the Agreement contained the amount that was "permanently forgiven," leaving a new principal note balance of $161,000.01 and the terms of payments. Section 3.D. states:

> The terms in this Section 3.D. *supersede any provisions to the contrary in the Loan Documents, and previous loan modifications* . . .[35]

Section 4, containing "Additional Agreements" between the Larkins and BOA, states:

A. All persons, or their authorized representative(s), who signed the Loan Documents [defined as the 2007 Mortgage and Note] have signed this Agreement, . . .

B. *This Agreement supersedes the terms of any modification, forbearance, trial period plan, or loan workout plan that I previously entered into with Lender.*

C. I will comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments, the amount of which may periodically change over the term of my Loan.

D. The Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

---

[33] Case No. 10-13339, Dkt. 104, p. 2 and p. 4, § 3. At § 4.A. of the Agreement, BOA and the Larkins agreed that "[a]ll persons, or their authorized representative(s), who signed the Loan Documents have signed this Agreement . . ." Dkt. 104, p. 5.

[34] Dkt. 104, p. 4, § 2.B.

[35] Dkt. 104, p. 5. Emphasis added.

**12**

E. All terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. Except as otherwise specifically provided in, and as expressly modified by, this Agreement, Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.[36]

Unlike the previous modification agreements, the 2015 Loan Modification Agreement replaced and extinguished the 2010 Loan Modification. While the prior agreements were executory accords that provided for modifications that were conditional upon the Larkins' compliance, the 2015 agreement is a novation, substituting "a new contractual relation" for an old one and extinguishing the former agreement:[37]

The distinction between a novation and an executory accord becomes significant in the event of breach of the new agreement. If the new agreement constitutes a novation, a breach does not revive the discharged claim and the parties' rights are controlled by the new agreement. [citations omitted]

On the other hand the effect of a breach of an executory accord is stated in the following: 'Since an accord executory operates at best no more than as a suspension of the antecedent claim, a material breach of the accord by the debtor lifts the suspension and makes the creditor's prior claim again enforceable.' [citation omitted].[38]

[36] Dkt. 104, p. 6. Emphasis added.
[37] *Elliott v. Whitney*, 215 Kan. 256, 259-260, 524 P.2d 699 (1974); *Cornwell v. Jespersen,* 238 Kan. 110, 119, 708 P.2d 515 (1985) (distinguishing effect of a novation from accord and satisfaction; novation is the extinction of an existing debt or obligation <u>and</u> its transition into a new one between the same parties). *See also Williams Petroleum Co. v. Midland Cooperatives, Inc.,* 679 F.2d 815, 819 (10th Cir. 1982) (Novation is the replacement of an unexpired contract by another contract reached through renegotiation);
[38] *Elliott v. Whitney,* 215 Kan. at 260.

13

Whether the agreement is a novation or an executory accord is a matter of intent.[39] The 2015 Loan Modification Agreement clearly expresses the parties' intention to supersede any prior modification. Even if it didn't, we could also infer the parties' intent to replace the 2010 Loan Modification with the 2015 Loan Modification because the provisions of the latter contract differ "radically" from the former.[40] The 2015 Loan Modification *permanently* forgave over $184,000 of principal, dropping the principal balance from $276,838 in the 2010 Loan Modification to $161,000. The interest rate plummeted from 4.5% to 2%. The total monthly payment was $1,914 under the 2010 modification; under the 2015 agreement, it fell to $1,183, subject to changes in escrowed items. The principal and interest portion of the monthly payment was halved, from $1,402.70 to $745.36, and the term of the mortgage loan was shortened by nearly 8 years. When the Larkins executed the 2015 Modification Agreement and the Court approved it, that modification extinguished the 2010 Loan Modification and, with it, any claim for breach of the 2010 Loan Modification.[41]

The Larkins' complaint fails to state a claim for relief for breach of the 2010 Loan Modification. The breach of contract claim should therefore be dismissed.

## IV. Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* claim based upon the 2010 Loan Modification

---

[39] *Id.*

[40] *Id.*

[41] In addition to the doctrine of novation, contract law provides that a later contract that conflicts with an earlier contract between the same parties regarding the same subject matter, effectuates a rescission of the earlier contract. *See Fleetwood Enters., Inc. v. Coleman Co.,* 37 Kan. App. 2d 850, 859-60, 161 P.3d 765 (2007) (quoting 17A C.J.S., Contracts § 416, p. 499); *Wiley v. Dixie Oil Co.,* 43 F.2d 51, 52 (10th Cir. 1930).

14

### A. Any FDCPA claims for violations that occurred prior to May 14, 2014 are time barred by § 1692k(d) of the FDCPA.

An action to enforce any liability under the FDCPA must be brought "within one year from the date on which the violation occurs."[42] The Larkins filed their complaint against BOA in the District Court on May 14, 2015. Applying the one-year statute, any FDCPA claim based upon a violation occurring prior to May 14, 2014 would be time barred. The Larkins concede their FDCPA claim is confined to misconduct or violations occurring after May 14, 2014.[43]

In Count II, the Larkins allege generally that BOA violated § 1692e of the FDCPA, by using false, deceptive, or misleading representations or means in connection with the collection of the mortgage loan, "since at least July 1, 2011 through the present date," incorporating the summary allegations of BOA's misconduct alleged in paragraphs 174(a)-(t) of the complaint.[44] The Larkins also allege that BOA violated § 1692f, using an unfair or unconscionable means to collect or attempt to collect the mortgage loan, "since at least July 1, 2011 through the present date," incorporating the summary allegations of BOA's violations alleged in paragraphs 174(a)-(t) of the complaint.[45] Because these claims must be based on violations occurring in the one-year period, they must be directed at the 2010 Loan Modification as incorporated by the confirmed plan after May 1, 2014.[46] While the

---

[42] 15 U.S.C. § 1692k(d).

[43] Adv. Dkt. 1-8, p. 20.

[44] *See* Complaint, Adv. Dkt. 2, ¶s 184-185.

[45] *See* Complaint, Adv. Dkt. 2, ¶s 186-187.

[46] Many of the more specific allegations in the complaint incorporated into the FDCPA count at ¶ 176, pertain to events that occurred prior to the bankruptcy, prior to confirmation, or

above allegations allege in a general fashion the nature of the unfair or unconscionable means and false, deceptive or misleading representations by reference to paragraph 174, that by itself is insufficient as it does not *specifically* identify which events occurred after May 2014 that violate the FDCPA.[47]

However, the Larkins allege elsewhere that, after confirmation, *each and every monthly loan statement* sent by BOA to the Larkins: (1) stated that "it is not an attempt to collect a debt while simultaneously including a payment voucher and payment instructions;" (2) provides that the Larkins are required to comply with the confirmed plan and modification terms, "despite [BOA's] blatant refusal to follow the terms of the Amended Plan and Court Ordered Modification;" (3) misrepresents the outstanding loan balance, the total amount of the next payment due, the amount of the principal and interest due for the next payment, the remaining loan term, and the interest rate; and (4) identifies "inspection fees" that violate the confirmed plan and loan modification.[48] The Larkins also allege that after confirmation of their amended plan, BOA "rejected *every payment*," and "refused to speak with them," citing the Larkins' pending bankruptcy, and refused to apply their payments.[49] Paragraphs 127-142 of the Complaint are sufficiently pled and furnish the post-May

---

prior to May of 2014 and are not actionable under the FDCPA. *See* Complaint, ¶s 16-66, 68-90, 98-126, 143-149.

[47] *See Twombly,* 550 U.S. at 555, 557 (labels and conclusions or a formulaic recitation of the elements of a cause of action are insufficient; naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief). The conduct described in ¶ 174 is the same conduct that Larkins allege in Count I that constitutes deceptive and unconscionable acts in violation of the Kansas Consumer Protection Act (KCPA). *See* Complaint, ¶174.

[48] Complaint, ¶s 127-135.

[49] Complaint, ¶s 136, 137, and 141.

2014 factual predicate for the Larkins' FDCPA claim, provided I can conclude that BOA is a "debt collector" subject to FDCPA liability.

> ### B. BOA was not a "debt collector" during the period May 2014 – May 2015; it was the servicer of the Larkins' 2007 mortgage loan debt that it originated and is therefore a creditor.

The Larkins must have sufficiently pled that BOA was a "debt collector" as that term is defined and used in the FDCPA during the May 2014 – May 2015 time frame when the alleged violations occurred. If BOA was not a debt collector, it can't be liable under the statute. A debt collector is a person or entity that engages in activity to collect a debt owned by someone else. Thus, the issue is whether BOA was engaged in activity to collect its own debt or the debt of another.

A "creditor" is defined in the FDCPA as:

> any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a *debt in default solely for the purpose of facilitating collection of such debt for another*.[50]

A "debt collector" is:

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, *debts owed or due or asserted to be owed or due another*. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. . . .[51]

---

[50] 15 U.S.C. § 1692a(4). Emphasis added.
[51] 15 U.S.C. § 1692a(6). Emphasis added.

This definition indicates that a lender or creditor collecting its own debts is generally not a "debt collector." The legal premise is that the principal business of a creditor is the extension of credit and the creation of the debt, not collecting it.[52] Likewise, the principal activity of a loan servicer is the servicing of the loan, not debt collection activity.[53] The second sentence quoted in the definition above is inapplicable here, as there is no contention that BOA used any name other than its own in its activities and dealings with the Larkins and their mortgage loan.

Many courts hold that mortgage lenders and servicers are not "debt collectors" under the FDCPA in connection with collecting their own consumer debts as opposed to claims owned by others.[54] This is true even when the mortgage lender "self-identifies" as a debt collector.[55] Of particular interest here are FDCPA decisions

---

[52] *Zsamba ex rel. Zsamba v. Community Bank, Abilene, Kan.,* 63 F. Supp. 2d 1294, 1300 (D. Kan. 1999) ("Debt collector" does not include the consumer's creditors; Bank's principal purpose is lending money, not the collection of debt).

[53] *Jenkins v. BAC Home Loan Servicing, LP,* 822 F. Supp. 2d 1369, 1374 (M.D. Ga. 2011).

[54] *See Herrejon v. Ocwen Loan Servicing, LLC,* 2013 WL 5934148 (E.D. Cal. 2013) (originator and servicer of mortgage loan were not debt collectors under FDCPA; complaint failed to substantiate defendants' status as debt collectors given allegations that OneWest originated plaintiffs' loan and that Ocwen merely serviced the loan); *Polidori v. Bank of America N.A.* 977 F. Supp. 2d 754 (E.D. Mich. 2013) (a bank that owns the debt to be collected is a creditor, not a debt collector for purposes of FDCPA and creditors are not subject to the FDCPA when collecting their accounts, citing *Montgomery v. Huntington Bank,* 346 F.3d 693 (6th Cir. 2003)); *Patrick v. PHH Mortg. Corp.,* 937 F. Supp. 2d 773 (N.D. W.Va. 2013) (company that was mortgagee or mortgage loan servicing company collecting its own consumer debt was not a debt collector); *Brush v. Wells Fargo Bank, N.A.,* 911 F. Supp. 2d 445 (S.D. Tex. 2012), *rejected on standing grounds in McCaig v. Wells Fargo Bank (Texas), N.A.,* 788 F.3d 463 (5th Cir. 2015); *Jenkins v. BAC Home Loan Servicing, LP,* 822 F. Supp. 2d 1369, 1374 (M.D. Ga. 2011) (mortgage servicers do not fall within the definition of debt collector); *Girgis v. Countrywide Home Loans, Inc.,* 733 F. Supp. 2d 835 (N.D. Ohio 2010); *Glazer v. Chase Home Finance LLC,* 704 F.3d 453 (6th Cir. 2013) (where Chase obtained the loan for servicing before default, it was not a debt collector under §1692a(6)(F)(iii)).

[55] *See Garrett v. BNC Mortg.,Inc.* 929 F. Supp. 2d 1120, 1127 (D. Colo. 2013); *JP Morgan Chase Bank, N.A. v. Horvath,* 862 F. Supp.2d 744 (S.D. Ohio 2012); *Nwoke v. Countrywide Home Loans, Inc.,* 2007 WL 3037118 (7th Cir. 2007).

18

relating to loan modification offers. In *Thomas v. JPMorgan Chase & Co.,* the district court held that mortgagees who denied borrowers' applications for permanent modification of their loans after mortgagors had participated in 3-month trial period plan under HAMP were not "debt collectors" under the FDCPA since they were attempting to collect the mortgage debts on their own behalf, rather than to collect debts owed another.[56] And in *Polidori v. Bank of America, N.A.,* a mortgage lender that allegedly "intentionally and deceptively" mailed a debt validation letter to mortgagor while he was attempting to obtain loan modification was not a "debt collector" within meaning of FDCPA because the mortgagee was the creditor bank that owned the mortgage at the time the letter was sent.[57]

Section 1692a(6) further restricts the definition of debt collector, by specifically excluding a collector that originated the debt being collected. Clause (F) provides:

> (F) Any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a . . . bona fide escrow arrangement; (ii) *concerns a debt which was originated by such person;* (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.[58]

BOA fits squarely into the § 1692a(6)(F)(ii) exclusion. BOA was the original lender when the $267,635 mortgage loan was made to the Larkins in February of 2007.[59] It is the lender identified in the original mortgage and note. It originated the loan and

---

[56] 811 F. Supp. 2d 781 (S.D.N.Y. 2011).
[57] 977 F. Supp. 2d 754 (E.D. Mich. 2013).
[58] 15 U.S.C. § 1692a(6)(F). Emphasis added.
[59] *See* Ex. 1, 2007 Mortgage attached in support of the Larkins' Memorandum in Opposition to the Motion to Dismiss, Dkt. 1-8. *See also,* Proof of Claim No. 7 with Larkins' 2007 note and mortgage attached.

19

the Larkins do not contend otherwise. The Larkins scheduled BOA as a creditor and BOA filed its proof of claim in the Larkins bankruptcy case. Both the 2010 and 2015 Loan Modification were between BOA and the Larkins. Indeed the 2015 Loan Modification identified BOA as "the servicer and/or lender for your loan ("Lender")." By the Larkins' own allegations, servicing of the loan was transferred to BOA effective July 1, 2011. So, even accepting the Larkins' allegations at face value and construing them in their best light, I conclude that BOA has been servicing the 2007 mortgage loan since July 2011.[60] The Larkins don't claim BOA was collecting anything other than the 2007 mortgage debt it originated. Nor do they contest the fact that the 2010 Loan Modification, the confirmed plan, and the 2015 Loan Modification agreement approved prior to the filing of this complaint, all relate to the 2007 mortgage debt originated by BOA. BOA was not a "debt collector" under the FDCPA's § 1692a(6)(F)(ii) exclusion.[61]

Because BOA was not a debt collector within the meaning of the FDCPA, it is excluded from FDCPA liability on these facts. I need not reach other grounds BOA

---

[60] *See* FDCPA, § 1692a(6)(F)(ii).

[61] *See Linthicum v. Bank of America,* 2016 WL 1389981 *2 (M.D. Fla. Apr. 7, 2016) (to the extent Bank was the originator of the loan, it does not qualify as a debt collector under the FDCPA); *Campbell v. Wells Fargo Bank, N.A.,* 73 F. Supp. 3d 644 (E.D.N.C. 2014) (plaintiffs' FDCPA claim failed because the Bank, as the originator of the debt at issue, is not a debt collector under the FDCPA, citing § 1692a(6)(F)); *Herrejon v. Ocwen Loan Servicing, LLC,* 2013 WL 5934148 (E.D. Cal. 2013) (originator and servicer of mortgage loan were not debt collectors under FDCPA); *Thomasson v. Bank One, Louisiana, N.A.,* 137 F. Supp. 2d 721, 724 (E.D. La. 2001); *Zsamba ex rel. Zsamba v. Community Bank, Abilene, Kan.,* 63 F. Supp. 2d 1294, 1300 (D. Kan. 1999) (plaintiff's interpretation of § 1692a(6) ignores clause (F)(ii); Bank was not a debt collector as defined by FDCPA); *Montgomery v. Huntington Bank,* 346 F.3d 693, 699 (6th Cir. 2003) (Bank not a debt collector where it was attempting to collect on a debt that was owed or due and that originated with it.).

20

raised concerning the FDCPA claim. The Larkins have failed to state a claim for relief under the FDCPA.

## V. Kansas Consumer Protection Act (KCPA), KAN. STAT. ANN. § 50-623, *et seq.* claims for BOA's post-confirmation activities and <u>conduct</u>

### A. Any KCPA claims for violations that occurred prior to May 14, 2012 are barred by the applicable statute of limitations.

The KCPA authorizes an aggrieved consumer to bring a private cause of action for the greater of money damages or a civil penalty.[62] As a state law statutory cause of action, the KCPA claim is subject to a 3-year statute of limitations.[63] The Larkins filed this action on May 14, 2015 and therefore, their KCPA claims are limited to violations occurring after May 14, 2012. The Larkins do not dispute that this is the only relevant and actionable time period.[64] As such, it encompasses violations that occurred beginning nearly four (4) months after confirmation of the 2010 Loan Modification in the amended plan on January 25, 2012.

Paragraphs 174(a) through (t) of the Complaint enumerate and describe twenty "deceptive and unconscionable acts" that the Larkins claim BOA committed,

---

[62] KAN. STAT. ANN. § 50-634(b) (2005). *In re Murphy,* 367 B.R. 711, 715 (2007) (statute permits recovery of damages or civil penalty, whichever is greater.). *See also* KAN. STAT. ANN. § 50-636(a) (civil penalty is limited to $10,000 per violation).

[63] KAN. STAT. ANN. § 60-512(2) (2005). *Campbell v. Hubbard*, 41 Kan. App. 2d 1, 7-8, 201 P.3d 702, *rev. denied* 286 Kan. 1176 (2008) (time limit for bringing a KCPA claim begins when the violation occurs; no discovery rule); *Four Seasons Apartments, Ltd. v. AAA Glass Service, Inc.,* 37 Kan. App. 2d 248, 250-52, 152 P.3d 101 (2007) (§ 60-512 contains no discoverability provision unlike a common law fraud claim); *Culp v. Timothy M. Sifers, M.D., P.A.,* 533 F. Supp. 2d 1119, 1127 (D. Kan. 2007) (KCPA claims not subject to discovery rule; claim accrued, for statute of limitations purposes, when defendant made alleged misrepresentations).

[64] *See* Dkt. 1-8, p. 20.

but these claims are general and not linked to any specific factual allegations in the complaint. Some describe pre-modification conduct that occurred before May 14, 2012 and is therefore outside the limitations period. But as with the FDCPA claim, the allegations in paragraphs 127-149 of the Complaint set up a post-confirmation factual predicate for the Larkins' KCPA claim. BOA contends that it can have no liability under the KCPA because (1) it is not a "supplier" within the meaning of the KCPA; and (2) any KCPA claims arising during the course of the bankruptcy case are preempted by the Bankruptcy Code. I agree.

### B. BOA is not a KCPA "supplier."

Section 50-624 of the KCPA defines a "supplier" as:

> . . . a manufacturer, distributor, dealer, seller, lessor, assignor, or *other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions,* whether or not dealing directly with the consumer. *Supplier does not include any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution.*[65]

The "supplier does not include" sentence of subsection (l), excluding certain banks from the definition, was the only change to the definitional section added by the Kansas Legislature in 2005 when it passed Senate Bill 57.[66] The Larkins argue that this somewhat inartful amendment was enacted in response to the Kansas Supreme Court's 1998 decision in *York v. Intrust Bank, N.A.* In *York,* the court held the bank

---

[65] KAN. STAT. ANN. § 50-624(l) (2015 Supp.). Emphasis added.
[66] *See* 2005 KAN. SESS. LAWS 65, Ch. 22.

was a supplier for purposes of the KCPA when it sold a residential lot the bank had received through a deed in lieu of foreclosure, to purchasers.[67]

The Larkins contend the exclusion from "supplier" doesn't apply here because this case does not involve a disposition of repossessed collateral. BOA, in turn, says that if the bank is regulated by federal or state law with respect to the disposition of repossessed collateral, such a regulated bank is not a supplier and therefore protected without regard to the type of consumer transaction presented. Looking first at the language of Senate Bill 57, the "subject to state or federal regulation" exclusion is introduced by the relative pronoun "which," a word that is usually employed to introduce a non-restrictive or independent clause. Here, "which" refers to the words "any bank, trust company or lending institution." As various grammarians note, an independent clause is one whose removal from a sentence does not change the sentence's meaning.[68] Thus, the "which" clause does not restrict or condition the exclusion of these institutions from being "suppliers." Even if it did, nearly every secured creditor's conduct in connection with the disposition of repossessed collateral is at a minimum governed by the Kansas Uniform Commercial Code and the Kansas Uniform Consumer Credit Code, two detailed and integrated schemes of state regulation.

---

[67] 265 Kan. 271, 962 P.2d 405 (1998) (bank "in ordinary course of its business" attempted to subdivide and develop property it repossessed, selling 57 individual lots or homes over a period of 5-6 years.), *called into doubt by statute as stated in Briscoe v. Cohen, McNeile & Pappas, P.C.,* 2014 WL 4954600, *11 n. 10 (D. Kan. Oct. 1, 2014).
[68] *See* Margaret Shertzer, *The Elements of Grammar,* pp. 7 and 18 (1986); *see also* Bryan A. Garner, *The Redbook: A Manual on Legal Style,* § 10.20 (2002).

23

No reported Kansas state court cases construe the 2005 amendment to the definition of supplier. In a line of unreported cases involving modifications or refinancing of mortgage loans, the federal district courts in Kansas have held that the KCPA applied because these attempted loan transactions and "financial communications" concerning them, were "consumer transactions" within the meaning of § 50-624(c) (2015 Supp.).[69] In each case, the courts cited the broad interpretation and liberal construction to be afforded the KCPA in favor of protecting consumers. In none of them, however, did the lender's motion to dismiss the KCPA claim challenge its status as a "supplier" under the KCPA, and the district court was not called upon to directly decide whether the lender was a "supplier."[70]

In every instance where a bank's status as "supplier" under the KCPA was directly before it, the United States District Courts have held that regulated banks are excluded from the definition, regardless of whether the case actually involves a disposition of repossessed collateral. Judge Marten recently addressed whether

---

[69] *See Sanchez v. Bank of America, N.A.,* No. 14-1142-JTM, 2014 WL 5800203 (D. Kan. Nov. 7, 2014) (Marten, J.) (rejecting Bank's contention that since no refinance was consummated there was no "consumer transaction"); *Rogers v. Bank of America, N.A.,* No. 13-1333-CM, 2014 WL 3091925 (D. Kan. July 7, 2014) (Murguia, J.) (rejecting Bank's contention that KCPA did not apply to its solicitation of loan modification then continually reassigning the borrower's application and requesting updated financial information); *Schneider v. Citibank, N.A.,* No. 13-4094-SAC, 2014 WL 219339 (D. Kan. Jan. 21, 2014) (Crow, J.) (unconscionable acts or practices occurring "before, during or after a transaction" are actionable under the KCPA; grant of home loan mortgage was a consumer transaction and therefore lender's failure to properly service loan, and refusal to refinance home loan stated a claim); *Shane v. CitiMortgage, Inc.,* No. 11-2689-JAR, 2012 WL 3111730 (D. Kan. July 30, 2012) (Robinson, J.) (rejecting contention that KCPA did not apply to loan refinancing or activity during servicing of loan after its origination, including cancellation of borrower's automatic debit).

[70] That said, the "financial communications" and dealings between the borrower and lender in two of those cases (in which BOA is the named defendant) are strikingly similar to what is alleged to have transpired here and quite troubling.

24

Discover Bank was a "supplier" under the KCPA.[71] Discover assigned the plaintiff's credit card debt to a law firm for collection. The plaintiff sued the law firm for violating the KCPA. An independent debt collection agency may be a supplier for purposes of the KCPA if, among other things, the parties to the original consumer transaction were a "supplier and a consumer."[72] The law firm claimed that Discover Bank was protected from being a "supplier" under the KCPA relying on the "regulated bank" exclusion in § 50-624(l). Judge Marten agreed that Discover Bank was not a supplier if it were subject to state or federal regulation. He rejected the plaintiff's contention that the exclusion only applies when the consumer transaction involves the "disposition of repossessed collateral," finding no law to support that narrow interpretation and concluding that the "regulated bank" exclusion was unambiguous:

> . . . the court cannot extrapolate this meaning [the plaintiff's interpretation] from the plain language of the statute. The court therefore concludes that Discover Bank is not a supplier under the KCPA if it is subject to state or federal regulation.[73]

He held that Discover Bank was not a supplier under the KCPA if it was subject to state or federal regulation concerning disposition of repossessed collateral.[74] But because the record on the motion to dismiss included no evidence concerning Discover

---

[71] *Kalebaugh v. Cohen, McNeile & Pappas, P.C.,* 76 F. Supp. 3d 1251 (D. Kan. 2015).

[72] 76 F. Supp. 3d at 1259, citing *State ex rel. Miller v. Midwest Serv. Bureau of Topeka, Inc.,* 229 Kan. 322, 623 P.2d 1343 (1981) (establishing a three part test that includes a requirement that the original creditor be a "supplier").

[73] 76 F. Supp. 3d at 1260.

[74] Unreported federal district court decisions reach the same result. *See Briscoe v. Cohen, McNeile & Pappas, P.C.,* No. 14-2146-DDC, 2014 WL 4954600 (D. Kan. Oct. 1, 2014) and 2014 WL 7363385 (D. Kan. Dec. 23, 2014) (Crabtree, J.); *Kastner v. Intrust Bank,* 2011 WL 721483 at *2 n. 3 (D. Kan. Feb. 22, 2011) (Humphreys, J.)

25

Bank's regulatory status, the Court was compelled to deny the defendant's motion to dismiss.[75]

I concur with Judge Marten's analysis.[76] Wittingly or not, the Legislature has created a sizeable hole in the KCPA through which banks like BOA can slip, regardless of their conduct. While the "guiding principle" of the KCPA is to protect consumers from suppliers who commit deceptive and unconscionable acts, a goal that requires liberal construction, that only goes as far as the words that are contained in the statute.[77] I cannot interpret words that aren't there or replace them with others.[78] Adopting the Larkins' interpretation would effectively rewrite the "regulated bank" exclusion in the definition of "supplier." That is a task for the Kansas Legislature, not me. [79]

---

[75] *Id.* at 1261, noting that the court could infer, based on its own general knowledge, that the Bank is subject to state and/or federal regulation but the record contained no evidence.

[76] I have previously recognized the KCPA "regulated bank" exclusion from the definition of supplier. *See ReVest, LLC v. Long (In re Long),* Adv. No. 09-5303, Case No. 09-12827, 2011 WL 976460 (Bankr. D. Kan. Mar. 1, 2011) (ReVest, not being a "regulated lending entity," was a supplier, offering a purchase and lease-back consumer transaction.).

[77] *See* § 50-623(b),

[78] *See Merryfield v. Sullivan,* 301 Kan. 397, 399, 343 P.3d 515 (2015) (The language of a statute is the primary consideration in ascertaining the legislature's intent because the best and only safe rule for determining the intent of the drafters is to abide by the language that they have chosen to use; the plain language trumps both judicial decisions and the policies advocated by parties.); *Golden Rule Ins. Co. v. Tomlinson,* 300 Kan. 944, 955, 335 P.3d 1178 (2014) (It is presumed that the legislature expressed its intent through the language of the statutory scheme and where it is plain and unambiguous, courts will not speculate regarding the legislative intent nor read into the statute something that is not there); *DeSpiegelaere v. Killon,* 24 Kan. App. 2d 542, 551-52, 947 P.2d 1039 (1997) (there was no statutory authority for awarding out-of-pocket expenses under the KCPA, rejecting argument that KCPA should be interpreted in same manner as civil rights cases).

[79] If the Legislature had intended to carve out lending institutions from the KCPA only for certain transactions (*i.e.* disposition of repossessed collateral), the logical place to effect that statutory change would be the definition of a "consumer transaction," under § 50-624(c). The court observes that "insurance contracts regulated under state law" are excepted from the definition of a consumer transaction. Alternatively, it could have amended § 50-635

26

I need not direct the parties to supplement the record with affidavits or other evidentiary matter to establish that BOA is a regulated bank as to disposition of repossessed collateral and excluded as a supplier. I may take judicial notice of the numerous provisions of commercial and banking law, both state and federal, that regulate a national bank's operations. In any event, because of the conclusions I reach on the preemption issue discussed below, there is no need to supplement the record further on the issue of whether BOA is a supplier.

### C. The Bankruptcy Code preempts the KCPA claims that accrued during the bankruptcy case.

Even if BOA were a "supplier," the Larkins' KCPA claims are grounded on events and misconduct that occurred during the Larkins' bankruptcy case. As noted previously, the KCPA claims are limited to events and conduct occurring after confirmation, between May 14, 2012 and May 14, 2015. They include BOA's failure to comply with the terms of the 2010 Loan Modification, its refusing and failing to apply payments, sending conflicting payment change notices and monthly loan statements, and refusing to communicate with the Larkins.[80] The alleged misconduct also includes "[n]eglecting, failing, and/or refusing to follow a Federal Bankruptcy Court Order."[81]

---

which governs the applicability of the KCPA. For example, in 2007 the legislature amended the KCPA to exclude licensed health care providers alleged to have committed malpractice from coverage of the KCPA, § 50-635(b).

[80] *See* Complaint, ¶s 127-149.

[81] *Id.* at ¶ 174n.

27

BOA relies on implied preemption under the Supremacy Clause of the United States Constitution.[82] It contends that the Larkins' state law KCPA claims that arose during the bankruptcy case are preempted by the Bankruptcy Code because Congress regulates or occupies the entire field of bankruptcy through the Bankruptcy Code and remedies exist thereunder.[83]

*Glannon v. Garrett & Associates, Inc.* supports BOA's argument.[84] In that case, the plaintiff made state law tort claims for malicious prosecution and abuse of process based on the defendants' bad faith filing of an involuntary bankruptcy petition, violation of the automatic stay, and prosecution of an adversary proceeding. Applying implied preemption, the *Glannon* court held that the Bankruptcy Code permits no state law remedies for abuse of bankruptcy provisions and dismissed the plaintiff's claim for failure to state a claim for relief. It concluded that the Bankruptcy Code "provides extensive federal remedies for improper conduct in bankruptcy proceedings," and that federal courts have exclusive jurisdiction over bankruptcy matters and bankruptcy remedies. It recognized that § 303(i) authorizes sanctions for involuntary petitions filed in bad faith, former § 362(h) [now codified at § 362(k)]

---

[82] U.S. CONST., Art. 6, Cl. 2.

[83] *See Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547 (7th Cir. 2012) (state law is preempted if federal law so thoroughly occupies a legislative field as to infer that Congress left no room for states to supplement it); *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir. 2000) (implied preemption discussed; state law claim for unjust enrichment for collecting debt under alleged improper reaffirmation agreement in violation of discharge injunction was preempted; Bankrupcty Court has equitable powers under § 105 to enforce discharge injunction); *General Motors Corp. v. Abrams,* 897 F. 2d 34 (2nd Cir. 1990) (consumer protection laws from unfair and deceptive practices is a traditional state police power function that federal laws may preempt under the Supremacy Clause of the United States Constitution); *Integrity Management Intern., Inc. v. Tombs & Sons, Inc.,* 836 F.2d 485, 487-88 (10th Cir. 1987) (discussing generally preemption of state law).

[84] 261 B.R. 259 (D. Kan. 2001).

28

authorizes recovery of damages, attorney's fees, and punitive damages for willful violation of the automatic stay, and § 105(a) authorizes the bankruptcy court to issue any order or judgment necessary or appropriate to prevent an abuse of process. The court also noted the availability of sanctions under Fed. R. Bankr. P. 9011. These "comprehensive provisions of the Bankruptcy Code," the bankruptcy court's exclusive jurisdiction over them, and the uniformity in the administration of bankruptcy laws, all demonstrate Congressional intent to preempt state remedies in bankruptcy proceedings.

The same concepts apply in this case. The Larkins' state law KCPA claims arise from BOA's failure to comply with the 2010 Loan Modification that was an integral part of their confirmed plan. The confirmation order is an order that this Court has inherent power to enforce. The Larkins had available remedies under the Code to enforce the confirmed plan and the 2010 Loan Modification.[85]  They could

---

[85] The case law is replete with "horror stories" similar to that of the Larkins' experience with BOA and the various means bankruptcy courts have to resolve them. *See e.g., In re Wright,* 461 B.R. 757 (Bankr. N.D. Iowa 2011) (debtors' motion to show cause for violation of terms of chapter 13 plan and for sanctions; post-confirmation violations of confirmed chapter 13 plan by mortgage servicer warranted sanctions; court awarded compensatory damages for actual loss of $10,000, punitive damages of $40,000, attorney fees, and additional sanction prohibiting servicer from raising amounts due by debtors without court approval); *In re Thrash,* 433 B.R. 585 (Bankr. N.D. Tex. 2010) (postconfirmation improprieties by mortgage lenders and servicers considered a violation of the automatic stay and order of confirmation, sanctionable under the inherent power of the court); *In re Cothern,* 442 B.R. 494 (Bankr. N.D. Miss. 2010) (describing mortgage servicer's conduct in servicing mortgage loan that led to debtors bankruptcy filing as egregious and quoting from screenplay for the movie, *The Hospital*: "The incompetence here is absolutely radiant."); In *re Schuessler,* 386 B.R. 458 (Bankruptcy. S.D.N.Y. 2008) (sanctioning mortgage lenders and servicers for violation of Rule 9011(b)(3), abuse of process and under § 105(a) for filing misleading motion for stay relief where debtors' postpetition payments were refused solely because debtors filed bankruptcy and substantial equity cushion existed); *In re Prada,* 2015 WL 7873749 (Bankr. S.D. Fla. Dec. 3, 2015) (Citimortgage's attempted repudiation of loan

have moved for an order to compel compliance with the confirmed plan. They could have cited BOA for contempt under 11 U.S.C. § 105(a) for violating the confirmed plan and pursued sanctions.[86] And finally, they could have (and did) object to BOA's proof of claim on the basis that it violated the 2010 Loan Modification and the KCPA.[87] Based upon the allegations of the Complaint, the conduct of which they complain was known and occurred both before and during their bankruptcy.[88] Instead of pursuing these bankruptcy remedies, the Larkins secured the more favorable 2015 Loan Modification and three weeks later, commenced this lawsuit and complained that BOA was violating the KCPA by not honoring the 2010 Loan Modification and confirmed chapter 13 plan.[89]

The Tenth Circuit has addressed the preemption issue in a chapter 11 case, *Paul v. Monts*, holding that a breach of contract action to enforce a confirmed but failed plan against non-creditor counter parties is not preempted because no Code

---

modification agreement incorporated into an amended chapter 13 plan that was confirmed without objection).

[86] The bankruptcy court has civil contempt powers under § 105(a). *See In re Skinner,* 917 F.2d 444 (10th Cir. 1990); *In re Scrivner,* 535 F.3d 1258 (10th Cir. 2008); *In re C.W. Mining Co.,* 625 F.3d 1240 (10th Cir. 2010) (civil contempt for violating automatic stay).

[87] *See* 11 U.S.C. § 502(b)(1). The Larkins were apparently satisfied with the resolution of their claim objection, because they ended up withdrawing the objection. Case No. 10-13339, Dkt. 59.

[88] *See Covert v. LVNV Funding, LLC,* 779 F.3d 242, 247-48 (4th Cir. 2015) (claims under FDCPA and state consumer protection and debt collection acts were dismissed on grounds of *res judicata* effect of confirmed chapter 13 plan); *Sampson v. Chase Home Finance,* 667 F. Supp. 2d 692, 696-97 (S.D. W.V. 2009) (plaintiffs' consumer protection challenges to allowed claim were barred by *res judicata* after plan was confirmed because the challenges could have been raised during the bankruptcy proceedings).

[89] *See Ward v. AMS Servicing, LLC,* No. 14-14052, 2015 WL 1432982, 606 Fed. Appx. 506 (11th Cir. Mar. 31, 2015) (where debtor stipulated that monthly mortgage payment was $1,319.50 in order denying stay relief, he was judicially estopped to sue the mortgagee under FDCPA alleging mortgage payment was supposed to be $1,182.89).

30

provisions specifically conflict with that action.[90] But many other appellate and bankruptcy courts hold that state law claims that are grounded on misconduct occurring in the bankruptcy proceeding, including those arising out of state consumer protection laws, are preempted by the Bankruptcy Code.[91] Because the Larkins' claims under the KCPA are grounded upon misconduct in contravention of the confirmed plan and 2010 Loan Modification, their complaint is easily distinguishable from the contract action in *Paul v. Monts*. I conclude that the Larkins' state law KCPA claim is preempted by the Bankruptcy Code. Count I of the Larkins' complaint is dismissed.

## VI.    Conclusion

If what the Larkins say is true, BOA behaved very badly. Unfortunately for them, I cannot rule with my heart. They failed to state plausible claims for relief.

---

[90] 906 F.2d 1468, 1476-77 (10th Cir. 1990) (Successor trustee's breach of contract action against non-creditors to enforce failed chapter 11 plan not pre-empted by modification provisions of the Code).

[91] *See Miles v. Okun (In re Miles),* 430 F.3d 1083 (9th Cir. 2005) (state law tort claims completely preempted by 11 U.S.C. § 303(i)); *Eastern Equipment and Services Corp. v. Factory Point Nat. Bank, Bennington,* 236 F.3d 117 (2nd Cir. 2001) (Bankruptcy Code preempted debtors' state law tort claims based on creditors' alleged violations of automatic stay); *Zaharescu v. Ocwen Loan Servicing LLC,* 2015 WL 1938385, 601 Fed. Appx. 534 (9th Cir. Apr. 30, 2015) (claims based on misuse of bankruptcy procedures are preempted by Bankruptcy Code.); *B-Real, LLC v. Chaussee (In re Chaussee),* 399 B.R. 225 (9th Cir. BAP 2008) (state law claims for alleged misconduct that occurs in connection with a bankruptcy case are preempted; bankruptcy claims allowance process preempts complaint for violations of Washington State Consumer Protection act); *Kline v. Mortgage Elec. Sec. Sys.,* 2010 WL 3786584 (S.D. Ohio Sept. 28, 2010) (Bankruptcy Code preempted action under Ohio Consumer Sales Practices Act where cause of action was grounded on defendant's filing of proof of claim in pending bankruptcy case); *In re Williams,* 392 B.R. 882 (Bankr. M.D. Fla. 2008) (Code preempts state law claims under Florida Consumer Collection Practices Act arising from wrongful conduct committed during course of bankruptcy case); *In re Johnston,* 362 B.R. 730 (Bankr. N.D. W.Va. 2007) (West Virginia Consumer Credit and Protection Act claim preempted by Bankruptcy Code where same activity is regulated by the Code).

31

That requires this proceeding to be dismissed for failure to state claims on which relief can be granted. BOA's motion to dismiss the complaint under Rule 12(b)(6) is therefore GRANTED. A judgment on decision will issue this day.

###